No. 13.—Robert Johnston, plaintiff in error, *vs.* Spencer Riley, defendant in error.

[1.] When there are three counts in a declaration, one of which is in the nature of a count for malicious prosecution, though concluding in trespass for false imprisonment, and one at least of the other two is a good count in trespass, there being no demurrer for misjoinder of counts: *Held*, that a general demurrer to the whole declaration, on the ground, that the plaintiff had misconceived his action, was bad, and was properly overruled.

[2 ] Where the bill of exceptions states, that the Court rejected evidence offered by the defendant, on the trial of an action of trespass for false imprisonment, of the plaintiff's general character, touching the *crimen falsi*, without stating what *particular facts* the defendant offered to give in evidence, and there being no allegation in the defendent's plea, which would authorize its admission: *Held*, that the evidence was properly rejected.

[3.] Sovereignty, united with the domain, establishes the *exclusive* jurisdiction of a State, or Nation, within its own territory, as to *crimes*, and to rights, arising therein.

[4.] Such *penal* enactments as might be wholly *useless* in some of the States of the American Union, are *indispensably necessary* in others, for the protection of property, and the welfare of society.

VOL. XIII 13

[5.] When the several States of the American Confederacy ratified and adopted the Constitution of the United States, they did not surrender the unquestionable right which then belonged to them, to declare, within their respective territorial limits, what should be considered therein *criminal offences* against their laws for the protection of persons and property.

[6.] Each State therefore, has the same undeniable and unlimited jurisdiction over all persons and things, within its teritorial limits, as any foreign Nation, where that jurisdiction is *not surrendered* or *restrained* by the Constitution of the United States.

[7.] When a demand is made by the Executive officer of one State for a fugitive from justice, who has taken refuge in another State, under the provisions of the Constitution and Laws of the United States, and a copy of the indictment found, or the affidavit made, as provided by the Act of 1793, shall be produced, and duly authenticated, as required by that Act, charging the person so demanded, *with having committed a crime against the Laws of the State from which he fled,* the Executive officer of the State upon whom the demand is made, for the surrender of such fugitive, must be governed by *the record produced;* he has no authority to make any addition to it, or to look behind the indictment or affidavit, and inquire, whether by the Laws of his own State, the facts charged there in, would constitute a *criminal offence;* but it is made his *imperative duty,* under the supreme law of the land, which he has sworn to support, to surrender up such fugitive to the authorities of the State whose laws have been violated, having *jurisdiction of the crime.*

[8.] When the Governor of Pennsylvania, made a requisition upon the Governor of Georgia, for the surrender of Robert J. Williams, as a fugitive from justice, founded upon an indictment found against said Williams, charging him with having committed a crime against the laws of the former State, and the Governor of the latter State issued his warrant for the arrest of Robert J. Williams *alias* Spencer Riley, by virtue of which Riley, a citizen of Bibb County, in this State, was arrested: *Held,* in an action of trespass for false imprisonment, brought by Riley against Johnson, the Agent of the State of Pennsylvania, who directed the arrest under the warrant so issued, that the Governor of Georgia had no legal authority to insert the *alias* in the warrant issued by him, but should have been governed alone by the record produced from the State of Pennsylvania, upon which the demand for the surrender of the fugitive was founded.

[9.] When a warrant issues for the arrest of W, and R is arrested under it, although R and W. may be the same person, all who are concerned in the arrest are trespassers.

[10.] To constitute a justification in such a case, the defendant must plead the warrant and other proceedings on which it is founded, and allege in his plea, that W and R, are, in fact *the same person,* and that R is as *well*

*known by the name of W, as by the name of R; or that R, at the time of the commission of the crime for which he is arrested, represented his name to be W.*

Trespass, for false imprisonment in Bibb Superior Court. Tried before Judge POWERS.   November Term, 1852.

Riley brought an action of trespass against Johnson, for false imprisonment.  When the plaintiff offered to read the declaration, the defendant demurred to said declaration, for that the action was misconceived, and should have been an action on the case; which demurrer the Court overruled, and sustained the declaration, and counsel for defendant excepted. The plaintiff then offered in evidence the following testimony :

In the Court of Oyer and Terminer and Quarter Sessions of the Peace for the City and County of Philadelphia, June Sessions 1850.   City and County of Philadelphia, S. S. :

The Grand Inquest of the Commonwealth of Pennsylvania, inquiring for the City and County of Philadelphia, upon their respective oaths and affirmations, do present: That Robert J. Williams, late of the said County, yeoman, on the thirtieth day of May, in the year of our Lord one thousand eight hundred and fifty, at the County aforesaid, and within the jurisdiction of this Court, with force and arms, &c., did falsely and fraudulently forge and counterfeit, and caused and procure to be forged and counterfeited a certain bond and writing obligatory, in the words, letters and figures—that is to say:

*United States of American, State of Georgia*—$10,000 *seven per cent. No.* 3.

The State of Georgia acknowledges to owe to Robert J. Williams the sum of ten thousand Dollars lawful money of the United States of America, which sum of money the said State promises to pay to the said Robert J. Williams, or bearer, at the city of Savannah, ten years from the date of these presents, or sooner, at the option of the State, with interest thereon at the rate of seven per centum per annum,

payable at the said city of Savannah annually on presentation of this bond, to be credited thereon.

The faith and credit of the State of Georgia are hereby pledged for the payment of this bond at the maturity thereof, and it is also to be considered a debt due by the Central Bank, pursuant to an Act of the General Assembly, passed the twenty-ninth day of December, eighteen hundred and forty-seven.

In witness whereof, and pursuant to said Act, the Governor hath hereunto set his hand and [SEAL.] caused the seal of the State to be affixed, this fifteenth of February, eighteen hundred and forty-eight. GEO. W. TOWNS, *Governor.*

On which said bond and writing obligatory was then and there endorsed, the words and figures following—that is to say :

"Robert J. Williams"—
And                          "SAVANNAH, Feb. 22d, 1849.
"Received of the Cashier of the Bank of the State of Georgia seven hundred dollars, it being the interest for one year on the within bond.          ROB. J. WILLIAMS.
"Received of W. B. Tinsley, Treasurer of the State, seven hundred dollars, the interest in full for one year on the within bond.
"18th Feb., 1850.          ROB. J. WILLIAMS."

With intent to cheat, and defraud the State of Georgia, aforesaid, contrary to the form of the Statute in such case made and provided, and against the peace and dignity of the Commonwealth of Pennsylvania.

And the Inquest aforesaid, on their oaths and affirmations aforesaid, do further present: That the said Robert J. Williams afterwards, to wit: on the day and year aforesaid, at the County and within the jurisdiction aforesaid, having in his possession a certain false, forged and counterfeited bond and writing obligatory, purporting to be a bond and writing obli-

gatory for the payment of the sum of ten thousand dollars, and to be signed by one George W. Towns, Governor—which said last mentioned false, forged, and counterfeited bond and writing obligatory, partly written, and partly printed, is in the words and figures following—that is to say:

*United States of America, State of Georgia*—10,000, *seven per cent. No. 3.*

The State of Georgia acknowledges to owe to Robert J. Williams the sum of ten thousand dollars lawful money of the United States of America, which sum of money the said State promises to pay to the said Robert J. Williams, or bearer, at the city of Savannah, ten years from the date of these presents, or sooner, at the option of the said State, with interest thereon, at the rate of seven per centum per annum, payable at the said city of Savannah annually upon the presentation of this bond, to be credited thereon. The faith and credit of the State of Georgia are hereby pledged for the payment of this bond, at the maturity thereof, and it is also to be considered debt due by the Central Bank, pursuant to an Act of the General Assembly passed the twenty-ninth day of December eighteen hundred and forty-seven.

In witness whereof, and pursuant to said Act, the Governor hath hereunto set his hand, [SEAL.] and caused the seal of the State to be fixed, this fifteenth of February in the year of our Lord one thousand eight hundred and forty-eight.

GEO. W. TOWNS, *Governor.*

On which said bond and writing obligatory was then and there endorsed the words and figures following—that is to say:

"Robert J. Williams."

"SAVANNAH, Feb. 22, 1849.

"Received of the Cashier of the Bank of the State of Georgia, seven hundred dollars, it being the interest in full for one year on the within bond.     "ROB. J. WILLIAMS.

"Received of W. B. Tinsley, Treasurer of the State, seven hundred dollars, the interest in full for one year on the within bond.

"18th Feb., 1850. ROB. J. WILLIAMS."

The same false, forged and counterfeit bond and writing obligatory, partly written and partly printed, as aforesaid, with the said endorsements thereon written for and as a good, true and genuine bond of the State of Georgia, for the payment of the sum of ten thousand dollars aforesaid, to Robert Johnston, then and there falsely, deceitfully and fraudulently did utter, publish and present and deliver, with intent to defraud the said Robert Johnston and Samuel M. Unk, trading together as R. Johnston & Co., of their goods and chattels, moneys and properties to their damage, contrary to good morals and against the peace and dignity of the Commonwealth of Pennsylvania.

W. B. REED, *For the Attorney General.*

JUNE SESSION, 1850.
Commonwealth *vs.* Robert J. Williams.
*First Count*—Forgery of Bond of the State of Georgia.
*Second Count*—Uttering and publishing said bond with intent to defraud. HENRY LEECH, *Foreman.*
*True Bill.* June 24th, 1850.
WITNESSES.
R. Johnston, sworn.
R. Crommeline, sworn.
DOCKET ENTRY.
Commonwealth *vs.* Robert J. Williams.
*First Count*—Forgery of Bond of the State of Georgia.
*Second Count*—Uttering and publishing said Bond with intent to defraud.
*True Bill.* June 24, 1850.
I certify that the above and foregoing are a true copy of the record in this case as it stands filed of record in the office of the aforesaid Court.

In testimony whereof, I have hereunto set [SEAL.] my hand and affixed the seal of the said Court, this twenty-fifth day of February, A. D. 1851.

JNO. WILLIAMS, *Clerk.*

*Commonwealth of Pennsylvania, City and County of Philadelphia—In Chambers, Eleventh March,* 1851.

I, Edward King, President Judge of the Court of Oyer and Terminer and Quarter Sessions of the Peace of the City and County of Philadelphia, duly commissioned and sworn, do hereby certify, that John Williams, whose genuine signature appears to the within and foregoing pages as Clerk of said Court, was at the time the same bears date Clerk of said Court, duly commissioned and sworn; and that full faith and credit ought to be had and given to all his official acts as such, and that the certificate of said Clerk and attestation is in due form of law.

Witness my official signature, this eleventh [SEAL.] day of March, 1851.

EDWARD KING, *President Judge, &c.*

COMMONWEALTH OF PENNSYLVANIA, S. S.

*William F. Johnson, Governor of said Commonwealth, to his Excellency the Governor of Georgia.*

It appears by the annexed papers, duly authenticated according to the laws of this Commonwealth, that a certain Robert J. Williams, stands charged by indictment in the Court of Oyer and Terminer and Quarter Sessions of the Peace, held in and for the City and County of Philadelphia, at June Sessions A. D. 1850, with the crime of forgery, committed in the County of Philadelphia aforesaid, in the State of Pennsylvania.

And it has been represented to me that the said Robert J. Williams fled from the justice of this State, and has taken refuge within the State of Georgia.

Now, therefore, pursuant to the provisions of the Constitution and laws of the United States, in such case made and

provided, I do hereby request that the said Robert J. Williams be delivered to Robert Johnston, who is duly authorized to receive and convey him to the State of Pennsylvania, to be dealt with according to law.

      Given under my hand and the less seal of the
[SEAL.] State, this the 25th day of June, in the year of
      our Lord one thousand eight hundred and fifty.
          WM. F. JOHNSTON.

STATE OF GEORGIA.
*By George W. Towns, Governor of said State.*
To all the Sheriffs and Constables thereof, greeting:

Whereas, a requisition has been made upon the Executive of this State, by the Governor of the State of Pennsylvania, to deliver to Robert Johnston, agent on the part of said State, the body of Robert J. Williams, (*alias* Spencer Riley,) as a fugitive from justice, who is charged with the crime of Forgery—

Now, in accordance with the provisions of an Act of Congress passed the twelfth day of February, seventeen hundred and ninety-three, respecting fugitives from justice; and in order that the said Robert J. Williams, (*alias* Spencer Riley) may be brought to trial for the offence of which he stands charged—you are hereby commanded to arrest and deliver him to the said Robert Johnston, agent as aforesaid, so that he may be carried to the State of Pennsylvania, within whose jurisdiction said offence is alleged to have been committed.

And I moreover, charge and require all officers, both civil and military, in this State, to be vigilant in endeavoring to apprehend the said Robert J. Williams, (*alias* Spencer Riley,) a fugitive as aforesaid.

Given under my hand and the seal of the Executive Department at the Capitol in Milledgeville, this first day of July in the year of our Lord one thousand eight hundred and fifty, and of American Independence the seventy-fourth.

By the Governor,        GEO. W. TOWNS.

J. M. PATTON, *Secretary Executive Department.*

GEORGIA, BIBB COUNTY.

I arrested the body of the within named Spencer Riley, as directed and required by the within named Robert Johnston, having tendered him to the said Robert Johnston, who requested me to hold him until he was ready to leave, and have him in custody.        THOS. BAGBY, *Sheriff.*

2d  July, 1850.


GEORGIA, BIBB COUNTY.

I have arrested the body of Spencer Riley of this County, by virtue of this warrant, having no other authority—said Spencer Riley having been pointed out by said Robert Johnston.  In obedience to this writ, I have also tendered said Spencer Riley to said Robert Johnston, agent.

THOS. BAGBY, *Sheriff.*


Thomas Bagby, sworn, says : I was Sheriff of Bibb County in 1850, and seized Spencer Riley under said warrant of Gov. Towns.  Riley proposed to Johnston after his arrest to remain in custody, and if he (Johnston) would specify the day said forgery was committed, he (Riley) would account for where he had spent every night for some weeks before and after that time.  Johnston refused to name the day, and Riley then proceeded to count up on his fingers how he had passed the time in May, 1850.  He missed one day, and then defendant said he was satisfied.  Defendant then directed Sheriff to hold plaintiff until next morning, as he expected to leave on the morning train, and would not want Riley until he started. Can't say at what hour said train left; thinks it was in the morning.

*Cross.*  Said conversation of witness, Riley and Johnston was near the Lanier House.  Johnston did not direct witness to do more than keep Riley safe.  Did not order him to jail. Defendant did not call for Riley after this conversation in respect to the *alibi.*  Judge Cole and not Johnston, handed Gov. Towns' warrant to the Sheriff.  Johnston was introduced to

the witness (Sheriff) after the warrant had been put in his hands by Judge Cole. I had never seen him before.

*Re-Examined.* Riley went out of my possession by judicial process. Think Johnston told me to keep Riley safe after he said he was satisfied, but he never called for him. Next morning Johnston was also in my custody. There is a mistake in the return on the warrant of Gov. Towns. Riley was pointed out by Judge *Cole,* and not by Johnston. Johnston seemed satisfied with the arrest. Can't say Johnston recognized Cole as his attorney. Saw them together.

The interrogatories of Andrew J. Hansell, William T. Hansell, Wm. Alexander, Julius Williamson, Thomas May, Reuben Cone and Michael Dixon, were read, and by them proved that Riley was in Georgia when the forged bonds were passed to Johnston in Philadelphia.

Plaintiff in the Court below closed..

Defendant, Johnston, then read the interrogatories of Anthony J. Drexel, as follows:

1st. I do not know Spencer Riley by that name, nor do I know that I ever saw him. I know Robert Johnston.

2d. About the latter end of May, 1850, we were applied to by a man calling himself Col. Williams, who said he was on his way to Europe to negotiate an amount of Georgia Bonds. I am one of the firm of Drexel & Co., Bankers in the City of Philadelphia, and was such in May, 1850, at No. 34 South Third Street. Col. Williams applied to us at our office for a loan of $6,000 or thereabouts, on said bonds, saying that he was taken sick at Richmond, Va., and had arrived here still unwell, and finding himself still unwell and unable to proceed to Europe as he had proposed, he wished to borrow the $6,000, and he would then return to Georgia, and return again to Philadelphia to pay the loan, and proceed to Europe in the course of two or three months to sell the bonds. The amount of the bonds was, I think, about $40,000 or $60,000. I do not know the amount exactly, as I did not count them. I think also they were 7 per cent bonds. The interest was payable in the City of Savannah. He left the bonds with us for one day, we promising

Johnston *vs.* Riley.

to give him an answer the next day; and in the meantime, on reflecting on the matter, we refused him the loan. He called the next day for the purpose of getting the bonds or the money. We refused the loan, but delivered the bonds to him. I should have stated above that Williams exhibited a letter to us at the time he brought us the bonds, purporting to be a letter from Joel Crawford, introducing the said Williams to Baring, Brothers & Co. of London, and stating that Williams' object in visiting London was to negotiate these bonds. In conversation. with said Williams, we mentioned, as an objection to the bonds, that the interest was payable in Savannah. He said that he was well acquainted with the Governor of Georgia, and would procure the interest to be also paid in New York. I saw nothing more of him afterwards.

3d. I do not know that the bonds were forgeries, but I suspected them at the time, and have understood since that they were forgeries. I have said that I thought the amount was $40,000 or $60,000. I do not know but I understood that Mr. Johnston, the defendant, advanced $6,000 upon them. I think the age of said Williams was between the age of fifty or fifty-five. He was stout built, round or stooped shoulders, about five feet eight or nine inches high, rather dark complection, but somewhat florid. He wore a broad-brimmed hat, and did not take it off when I saw him, and hence I cannot tell the color of his hair. He was rather slow and measured in his speech. His address was gentlemanly, and his dress also. He wore dark clothes, black I think. He wore a white neckhandkerchief. His voice was mild, not a bass, and I did not doubt from his appearance but that he was what he represented himself to be, a Georgian. I know nothing further in answer to this interrogatory, but I have understood the defendant has lost all he advanced.

4th. I do not know anthing in answer to this interrogatory, except what I have already stated in reference to the letter of introduction of Joel Crawford to Baring, Brothers & Co. of London. I have already stated all I know of that letter. I know that it is usual for bankers or brokers to give receipts

for collaterals, and also to hand cards to persons with whom they are doing business—that is, strangers when they first come in.

5th. I know nothing in answer to this interrogatory, further th&n I have stated, and I have stated all I know about this transaction as far as I now can recollect.

1st. *Cross Interrogatory.* I have never heard a description of Spencer Riley's appearance either since or before this suit was instituted. I would know the Col. Williams of whom I have spoken if I were to see him again, unless he were disguised.

2d. I am a banker, and reside in the City of Philadelphia. I am twenty-five years of age. I have no interest in this suit, and can neither gain or lose anything by it.

3d. I know nothing about the matters asked in this interrogatory.

4th. I understood the amount loaned by Mr. Johnston was $6,000, but I know nothing about the matter asked about in this interrogatory, except as above stated.

5th. I know nothing in reference to the matters inquired about in this cross interogatory, and never heard the defendant state anything of the sort.

6th. I never heard Mr. Johnston say anything about the guilt or innocence of Spencer Riley, nor did I ever hear him say anything about releasing or detaining Riley.

### Answers of E. L. Moss.

1st. I know Mr. Johnston, the defendant, well.

2d. I was called upon by Morris DeYoung, a broker of this City, with certain bonds, purporting to be the bonds of the State of Georgia, about the latter end of May, 1850. It was at my office No. 80 Walnut St. in the City of Philadelphia. The bonds were about ten in number, in the aggregate amounting to about $60,000. They were scrutinized very closely indeed by my brother, J. L. Moss, and myself. They were in our possession for one hour or more, for the purpose of negotiation. They had a very large wax seal suspended

Johnston *vs.* Riley.

or attached by a ribbon, purporting to be the seal of the State of Georgia. They were made payable to Robert J. Williams, and were endorsed by him. The writing in the body of the bonds was very uniform, and the endorsements were of the same character. Mr. DeYoung, the broker, offered to bring the person calling himself Robert J. Williams to my office. Williams was the person for whose benefit De-Young wished to negotiate the bonds. I declined negotiating the bonds, or to see Robert J. Williams, and returned the bonds to DeYoung.

3d. I was satisfied of the fact that the bonds were forgeries when in my hands, and stated that fact to DeYoung. I understood they were forgeries afterwards. The amount was about $60,000, I think. I understood that Mr. Johnston subsequently advanced $6,000 upon these bonds. I never saw Robert J. Williams, and know nothing of him or his appearance. I understood Mr. Johnston lost the whole amount advanced, $6,000.

4th. I know nothing of any such receipt or business card having been given by defendant, Robert Johnston, to any one, but it is an every-day practice for brokers to give receipts for collaterals to persons doing business with them. I think I had in my possession, in connection with the bonds, a letter of introduction of Robert J. Williams to Barings, Brothers & Co. of London; but I do not remember by whom the letter was signed.

5th. I know nothing further than I have already stated, and have stated all I know in reference to said transaction.

1st *Cross.* I never have heard at any time, either before or since the institution of these suits, a description of Spencer Riley. I would not know Robert J. Williams, as I never saw him.

2d. I am a licensed Note and Bill Broker at No. 80, Walnut St. Philadelphia. I am forty-five years of age. I have no interest in either of these suits, and will neither gain or lose anything by them.

3d. I know nothing in reference to the matters asked about in this cross interrogatory.

4th. I understood the amount loaned was 6,000. I know nothing about the rate of interest, or terms.

5th. I know nothing in answer to this cross interrogatory.

6th. I know nothing and never heard anything from defendant, or any one else, about the matters inquired about in this cross interrogatory.

7th. I never heard Mr. Johnston say anything at any time about the guilt or innocence of Spencer Riley, or about his releasing or detaining him, or anything of the kind. And farther the deponent saith not.

### George W. Towns' Testimony.

1st. Witness says he knows the parties.

2d. Witness presumes he knows something of the circumstances that induced defendant to visit Georgia about July, 1850.

Witness states that he first saw defendant to know him in Milledgeville about the time stated above. A short time previous to witness' first interview with defendant, a letter was placed in his hands by one of the Secretaries of the Executive Department, purporting to have been written by the defendant from Philadelphia, stating, among other things, that a man calling himself Robert J. Williams, of Stewart County, Georgia, had hypothecated the bonds of the State for a large sum, as witness now recollects, amounting to over $60,000, on which securities he had made an advance of several thousand dollars. The object of the letter was to know if the State had issued such bonds, and it also contained a minute and circumstantial description of the individual calling himself Williams. While the subject of the letter was under consideration, a gentleman of high character and extensive acquaintance in the State called at the Executive Office, and as witness was satisfied no such bonds had been issued by authority of the State as described in Johnston's letter, he felt it his duty, and a solemn duty resting on him, to spare no

Johnston *vs.* Riley.

pains in ferreting out the individual that had put them in circulation. With this view, the letter from Johnston was read to the gentleman referred to, who did not hesitate to express his belief, from the discription, that it was the plaintiff; and witness states from the facts that had occurred, as detailed to him, as well as the description contained in the letter of Johnston, he did feel strongly inclined to believe that the Robert J. Williams of Pennsylvania was the Spencer Riley of Georgia. Witness directed a letter to be addressed immediately to the correspondent of Robert Johnston, in Savannah, giving all the information he had collected. In a few days thereafter, the defendant for the first time called at the Executive Office with the bonds, a letter purporting to have been written by Robert J. Williams to a Mr. Cromlein of Philadelphia, and mailed in Savannah. On looking into this letter, witness found it containing information in relation to witness' absence from Milledgeville, the place to which he had gone, and the time of his expected return—all of which was true—and which information one of the Secretaries of the Executive Department informed witness he had communicated to Riley in the forenoon of the day after witness had left Milledgeville. This circumstance, together with the fact that there was time for a letter to be written by plaintiff and transmitted to Savannah, there mailed to correspond with the Post Office mark of Cromlein's letter, and the farther fact that witness did not recollect having communicated after leaving Milledgeville—facts which the Secretary states he had made known to the plaintiff—produced a strong impression on the mind of witness, connected with other circumstances—one of which was, that Mr. Riley had been absent from Macon about the time defendant represented this transaction to have transpired, sufficient time to have allowed him to have reached Philadelphia. From the above stated facts, witness did believe the plaintiff was the man that had the transaction with defendant in Philadelphia. Witness communicated his suspicions and other facts and circumstances upon which they were

based, to defendant, as did other gentleman in presence of witness.

3d. The defendant presented a requisition from the Governor of Pennsylvania. Witness cannot say what knowledge the defendant had of the plaintiff on first reaching Milledgeville. It is the impression of witness, from a conversation with defendant at their first interview, he had no knowledge of plaintiff by the name of Spencer Riley. Witness has stated in the preceding interrogatory the most of the circumstances that induced witness to believe plaintiff was the individual that hypothecated the bonds to defendant in Philadelphia; and acting under that belief, he believed it to be his duty, under the law, to cause the true intent of the requisition of the Executive of Pennsylvania to be complied with by the apprehension of the individual by whatever name he might have assumed in Pennsylvania in violating her laws to be apprehended in this State, if within its limits.

4th. Witness has answered this interrogatory "fully and sepcifically" in the second and third direct interrogatories.

5th. When the warrant was issued against Robert J. Williams, *alias* Spencer Riley, witness believed it his duty, independent of the circumstences of suspicion detailed in the preceding interrogatories, that satisfatory proof of the identity should be furnished before the warrant was actually delivered over. The defendant expressed his entire belief that he should recognize the man with whom he had the transaction in Philadelphia under the name of Robert J. Williams, if he should see him. Witness therefore placed the warrant in the hands of Col. John T. Smith, one of the Secretaries of the Executive department, and directed him to retain the same in his possession until the defendant could see the plaintiff and satisfy himself whether he was the man who hypothecated the bonds to him in Philadelphia under the name of Robert J. Williams. While the warrant was in the hands of Col. Smith under instructions, witness did not consider the warrant under his custody, but a paper subject to be returned to the Executive department and cancelled. Witness' object was to make

the issuing of the warrant in fact dependent on the proof by Johnston of the identity of Riley and Williams as the same person, which he then believed and now believes was his duty under the law and the facts before him.    Witness also authorized his Secretary, Col. Smith, in the event Riley was recognized by Johnston as the individual who hypothecated the forged bonds to him in Philadelphia and was arrested, and an effort should be made to discharge Riley from any defect in the warrant, to employ counsel to defend the same.    Witness was informed Judge Cole was employed for this purpose, and he believes has been paid for this service a reasonable fee.

To the first *cross interrogatory* witness answers: The name of Spencer Riley was not inserted in the requisition of the Governor of Pennsylvania.

2d. Witness says the date of the warrant will shew the time of the first legal steps taken against Riley, which was about the first of July, 1850.

3d. If Col. Smith handed the warrant to the defendant, Johnston, in Macon, upon his recognizing Riley, the defendant received it doubtless with a full knowledge of the substance and import of the proceeding had in Pennsylvania as well as at the Executive Office in Georgia.

4th. Witness does not know, of his own knowledge, that the defendant refused to dismiss the warrant upon being satisfied of Riley's innocence.    What occurred on that subject will be hereafter detailed.    The defendant insisted, in his conversation with witness, that he should be compelled upon oath to say that he believed Riley to be the individual with whom he had the transaction in Philadelphia.

5th. Witness says, pending the proceedings had against Riley in July, 1850, and against Johnston, witness visited Macon, and had inverviews with the defendant, Johnston, and Judge Cole.    Among other things now recollected by witness that passed in those interviews, Johnston said to him in substance that he had proposed to Mr. Stubbs, one of the counsel of plaintiff, if he would account for Riley's absence from Macon by respectable testimony, he did not wish to carry him

away, and would consent to withdraw the warrant. But Mr. Stubbs failed to do so. Witness informed Johnston he had, upon arriving in Macon, received information that satisfied his mind that Riley would be able to prove an _alibi_, and that Col. Logan and lady and Mr. Rose, witness was informed, would testify that they had seen Riley on the Macon and Western Railroad on a certain day, which would render it impossible for Riley to have been in Philadelphia at the time he (the defendant) stated the transaction to have taken place, and that he (witness) should be bound to believe that Col. Logan and lady and Mr. Rose were less liable to be mistaken, as they had long known Riley, than defendant was, and that witness could not take any part in favor of Pennsylvania against a citizen of Georgia, however badly witness might think of Riley's character, under such respectable proof as to his innocence. And witness further remarked to defendant, if similarly situated to himself, he should feel it his duty to at once go forward and make a suitable explanation to Riley. Johnston was yielding in his feelings, and so far as witness could infer from his conversation, he certainly saw nothing indicating the least malice on the part of Jonhston towards Riley, but seemed inclined to submit the whole matter to Judge Cole, under whose advice he had acted. Witness' own impression was that Johnston was laboring under such apprehension of bodily injury from Riley and his friends, as disqualified him, in a great measure, to carry out his own notions of propriety, and he seemed inclined to submit everything to the hands of Judge Cole for his decision. Witness returned from Macon to Milledgeville, and presumes Riley was in custody of the Sheriff of Bibb County, but does not know of his own knowledge.

Witness says, in answer to the latter part of the question, namely, "Are you friendly towards Riley?" that he has no respect for or confidence in Riley, and that he should be compelled to give the same answer in relation to others, if interrogated.

The want of confidence and respect for Riley mainly grew out of transactions imputed to him in procuring grants to re-

verted lots of land, which came to the knowledge of witness in his discharge of his official duty as Governor of the State.

6th. Witness has substantially stated the substance of all he recollects in preceding interrogatories, except what will be more appropriate in answer to the next cross interrogatory.

Witness says, in answer to the last cross interrogatory, that he has stated the authority he gave to employ counsel, and the object for which he directed counsel to be engaged. Witness, on his visit to Macon, had conversations with Judge Cole in relation to the case against Riley, and the cases of Riley against Johnston, on one occasion, in the presence of Mr. Johnston, in my own room in the Lanier House. Witness has no recollection to have heard from Judge Cole or Johnston that the issuing of the search warrant was at the instance of Johnston and against the advice of Judge Cole; but on the contrary, witness was impressed with the belief that the search warrant was issued under the advice of Judge Cole alone. Witness thought, and so expressed himself, that this was a harsh step. The recollection of witness is, that in the conversation referred to, Judge Cole defended the propriety of the act, and insisted he was fortified with authority to sustain it, and that therefore Johnston could not be held responsible. Such was certainly the impression left on mind of witness from the last interview with Judge Cole and Johnston. Finding Judge Cole acting as counsel for Johnston in the case of the search warrant and the cases instituted by Riley against Johnston, witness did not feel at liberty to take any very active part in advising, but did see one or two gentlemen, and ask of them to interest themselves with a view of an amicable settlement between Johnston and Riley in this movement. I felt authorized from conversations with Johnston.

The next morning witness left Macon, and his connection with the case here ended.

*Answers of Julius M. Patton.*

1st. Witness answers, he had a slight acquaintance with both the parties.

2d. Witness answers, that a letter was received at the Executive Office of Georgia in June last, (1850,) signed R. Johnston & Co. addressed to Gov. Towns, which letter is here attached marked No. 1. This letter was received in the absence of Gov. Towns, and witness replied to it, and stated to Messrs. R. Johnston & Co. that there was no doubt that the bonds hypothecated with them were forgeries. Subsequently, and after the return of Gov. Towns, and about the 25th June, as well as witness recollects, the letter of R. Johnston & Co. above referred to, was submitted by direction of Gov. Towns to a gentleman of this County who had long resided in Georgia, and had a general acquaintance throughout a large portion of the State.

This gentleman, from the description given in said letter of the personal appearance of the individual who represented himself in Philadelphia as Robert J. Williams, and from some circumstances within his own knowledge, had his suspicions excited that the plaintiff in this case was the individual who passed himself off as Robert J. Williams in Philadelphia.

On the same day witness, under the instructions of Gov. Towns, addressed Padleford, Fay & Co. of Savannah, requesting them to telegraph Messrs. R. Johnston & Co. of Philadelphia, requesting that some one would come on immediately who could identify the individual who represented himself in Philadelphia as Robert J. Williams; that suspicion rested upon a person in this neighborhood. A copy of said note was not retained by witness, as the hour for closing the mails that day was near at hand.

The answer of Padleford, Fay & Co. to said note is hereto attached, marked No. 2.

On the first day of July last, Robert Johnston, the defendant, reached this place, bringing a requisition from the Governor of Pennsylvania upon the Governor of Georgia, requesting that Robert J. Williams might be delivered to Robert Johnston, to be by him conveyed to the State of Pennsylvania, to be dealt with for the crime of forgery, &c. Said re-

quisition has been in charge of witness ever since, and is hereto attached, marked No. 3.

Mr. Johnston also exhibited a letter signed Robert J. Williams, dated Savannah, June 15, 1850, and addressed to Mr. Cromlein of Philadelphia, in which letter the writer referred to the absence of Gov. Towns from the seat of government, in language very similar to what had been used by witness in replying to an inquiry made by Spencer Riley, the plaintiff, in the Executive Office on the fourteenth day of June last, as to what time the Governor would return.

The Governor had left this place before Riley came into the office, and as Riley expressed much anxiety to see him in reference to some grants which had been fraudulently issued or obtained, and which grants Riley then had in his possession, witness was more particular than usual in informing him when the Governor would probably return. These circumstances, together with the additional fact that Spencer Riley, the plaintiff, was understood to have left Macon about the 17th day of May, and to have been absent for sometime, were communicated to defendant by witness and others.

3d. For answer to the first part of this interrogatory, witness refers to his answer to the second interrogatory.

Witness is unable to say whether or not defendant had any knowledge of such a man as Spencer Riley, the plaintiff, before he came to Georgia in July last.

The name of Spencer Riley in the *alias* form was inserted in the warrant issued by Gov. Towns by his (Gov. Towns') direction, with which defendant had nothing to do. And the said warrant was delivered to Col. John T. Smith, a Secretary in the Executive Department, with instructions from Gov. Towns to accompany Mr. Johnston to Macon, and not to deliver said warrant to any officer until he (Mr. Johnston) should identify Spencer Riley as the Robert J. Williams of Philadelphia.

4th. Witness for answer, refers to his answer already made, and further answers, that several papers on file in the State House, which were signed by Spencer Riley, were exhibited

to defendant, and a comparison of the handwriting on said papers, and the hand-writing on the bonds which had been passed off in Philadelphia, was made, and that persons around who examined the same, thought there was in some instances considerable similarity, and so expressed to defendant.

5th. Witness answers, that he has stated all that he of his own knowledge knows that will benefit defendant.

To the first cross interogatory, witness answers, that when the warrant was made out in July last, under the requisition of the Governor of Pennsylvania, the name of Spencer Riley was inserted in the *alias* form, as already stated.

2d. Witness answers, that the name of Spencer Riley does not appear in the requisition of the Governor of Pennsylvania. It was first used in the proceedings when the warrant of Gov. Towns, in obedience to said requisition, was issued in July last.

3d. Witness answers, that defendant told him that the transaction in Philadelphia was made the 30th day of May in the last year.

4th. Witness answers, that he knows nothing in reference to the matter therein inquired about.

[No. 1.]

PHILADELPHIA, June 14, 1850.

GEO. W. TOWNS, ESQ.

 *Governor State of Georgia:*

Dear Sir: We have before us from our correspondent Padelford, Fay & Co. of Savannah, the reply of the Cashier of the Central Bank of Georgia to inquiries made in relation to $65,000 bonds, represented to us by an individual calling himself Col. Robert J. Williams of Lumpkin, Stewart County, Georgia, to be genuine 7 per cent. bonds of the State of Georgia, &c. Permit us to say, that the individual was a very respectable looking individual, about 50 years of age, calling himself a cotton planter, dignified and intelligent; was well and minutely acquainted with Georgia and Alabama localities and individuals; not particularly communicative, but

promptly answered all questions without hesitancy. His personal appearance was rather stout, mixed grey and black hair; common black clothes, pantaloons of black lasting; common country looking fur hat, coarse country boots, sallow, sunburnt skin, face and hands; formation of his face round and rather full; pleasant expression; his address easy. He exhibited a letter of introduction from J. Crawford to Baring, Brothers & Co. of London. He represented Mr. Crawford as being an acquaintance of the Barings, who had visited London to dispose of similar bonds. He spoke of personal acquaintance with the Governor, &c. When he first made his appearance, he stated that he had left home with the intention of going to London that he might dispose of said State bonds to better advantage than he could do at home. At Milledgeville, on the 8th May, he stopped, and to facilitate the sale in London, obtained from George W. Harrison, Secretary of State, a verification of the bonds having been issued to the holder, Robert J. Williams, according to law, and were duly signed by the Governor, &c.—which certificate was attached by ribbon and seal to the bonds, and thus fastened.

There were four bonds of $10,000 each, numbered 3, 4, 5 and 6; Nos. 8, 9, 10 and 11 of $5,000 each; and Nos. 11, 12, 13, 14 and 15 for $1,000 each—in all $65,000—presented to us as security for an advance of $6,000, payable Sept. 1, ensuing, through a gentleman whom the said Williams induced for a bonus to undertake to assist him in obtaining the money. The bonds are all dated in February and March, 1848, and the payment of two years interest endorsed on them.

When Williams reached Richmond, Va. he stated that he was taken sick, and remained there some days. When he reached Philadelphia, he was too ill to proceed further, and concluded to abandon the idea of going to Europe, &c. and determined on borrowing $6,000 on the bonds to enable him to bring his family north to spend the summer; that in the fall he would go to London after he had obtained money from his cotton factors to take up his bonds, &c. He was very

plausible in his intercourse, and made it as his reason for asking only for $6,000 on his $65,000 bonds, that that was as much money as he would want to spend, and he did not wish to detach the bonds, &c.

You will perceive the propriety of instituting some inquiries to ascertain who has been at the bottom of this great forgery, if the bonds be forgeries. It may be that the individual is connected in some way with parties now residing in your vicinity, he was so intimately acquainted with men and things in Georgia and Alabama.

We beg of you to give your earnest attention to the matter, and address us at your earliest convenience.

Yours truly,

R. JOHNSTON & CO.

[No. 2.]

SAVANNAH, June 26th, 1850.

J. M. PATTON, ESQ.

   *Secretary Executive Department, Milledgeville:*

Dear Sir : By this evening's mail we are favored with yours of the 25th inst. the contents of which are duly noted. We have telegraphed Messrs. R. Johnston & Co. of Philadelphia, in accordance with your instructions, and am in hopes that the individual who hypothecated the fraudulent bonds with those gentlemen may yet be brought to justice.

We annex copy of letter from Messrs. J. & Co., and are

Yours very respectfully,

PADELFORD, FAY & CO.

The individual referred to is described by Messrs. J. & Co. as follows :

About 50 years old, 5 feet 8 inches high, grey hair, common black dress ; calling himself Robert J. Williams, &c.

*Answers of John T. Smith.*

1st. He answers, he is acquainted with the parties.

2d. He says he has no personal knowledge of the circum-

stances under which the defendant came to Georgia about the month of July last.

3d. He says he has no personal knowledge of defendant bringing to Georgia a mandate from the Governor of Pennsylvania to the Governor of Georgia, but is advised and believes such a mandate was brought by defendant. The defendant, so far as witness knows, had no knowledge of the existence of such a person as the plaintiff until after the arrival of the defendant in Milledgeville on or about the 1st day of July last. Witness was informed on the 18th of May last, by Mr. T. R. Bloom, of Macon, that he (Bloom) had called at the residence of plaintiff (Spencer Riley) on the 17th May, to see said plaintiff, (Riley,) and was informed by Riley's wife that he (Riley) had left that morning (17th May,) on the cars of the Macon & Western Railroad.

Witness further states, that said Thurston R. Bloom said to said witness that Riley had *bugged* or *tricked* him (Bloom) and Charles Day in obtaining grants for them from the State of Georgia.

Bloom further informed witness that he (Bloom) and Day had quite a list of numbers of land for which grants had been obtained for them by Spencer Riley, their agent, and that these grants must have been improperly obtained, for the reason that the records of the several offices in the State House did not shew that these grants had properly passed the several officers to Charles Day or T. R. Bloom. Witness has now in his possession a grant purporting to have issued on the 3d day of February, 1842, to Spencer Riley for lot of land No. 360 in the 20th district of Early County, originally; and from a proper examination of all the proper records of the several State House offices, there is no evidence to sustain this supposed grant as having issued to Spencer Riley. Witness has another grant in his possession purporting to have issued on the 3d February, 1842, to Wm. B. Parker of Bibb County, which he is informed, and is advised and believes, that said grant was obtained by said Spencer Riley as the agent of said Wm. B. Parker; and from a careful examination of

the proper records in the several offices of the State House at Milledgeville, no evidence is found to exist that said grant ever issued to W. B. Parker. These circumstances, in connection with the reported absence of Riley from Macon, induced witness to suggest to defendant that plaintiff (Riley) was the person whom he came to Georgia to find. Witness accompanied defendant to Macon in charge of the Executive warrant for the arrest of Robert J. Williams, *alias* Spencer Riley, and the warrant was not delivered until after defendant had fully identified Riley in the streets of Macon as being the person who committed the offence in the City of Philadelphia on the 30th May last.

4th. Witness says this interrogatory is fully answered the third direct interrogatory.

5th. He says he knows nothing more that will benefit defendant.

To the first and second cross interrogatories he answers, he knows nothing of the making out of the original warrant, or the insertion of the name of Spencer Riley.

3d. He answers, defendant stated to witness, that the offence of Williams was committed in Philadelphia on the 30th May, 1850.

4th. He answers, that he is not aware that the defendant was informed before the arrest of Riley, that he (Riley) was never in Philadelphia. Witness was in Macon on the day of the arrest, and did not hear until the day after the arrest that Riley was in Georgia at the time the alleged offence of Robert J. Williams was committed.

### *Answers of Alfred M. Nisbet.*

1st. He answers, he knows the parties.

To the 2d, 3d, 4th, and to the 1st, 2d and 3d cross interrogatories, he answers, that of his own knowledge he knows nothing.

To the 5th direct interrogatory, he answers, that upon being called upon by his Excellency Gov. Towns, to pronounce upon the character of the State bonds in the possession of

the defendant, and supposed to be spurious, he compared them with the records of the Central Bank of Georgia, of which he was then and still is Cashier, and found that no such numbers had been issued; and further that instead of having the new bond seals impressed upon them, that they had attached to them the old wax seal of the State. From these facts, deponent did not then nor does not now hesitate to pronounce the bonds imposed upon the defendant as base counterfeits, and utterly worthless.

Deponent would further state, that all the genuine bonds of the character and description of those imposed upon the defendant were issued by the Central Bank of Georgia.

### Answers of Rowland Cromlein.

1st. He answers, I do not know Spencer Riley. I know Robert Johnston as a man who loaned money to Robert J. Williams. Robert Johnston is a broker residing in the City of Philadelphia.

2d. He answers: On the 27th May, 1850, Monday evening, at my residence No. 141 North 13th Street, Philadelphia, Mr. Isaac Nathans told me that a gentleman named Williams called on him to borrow six thousand dollars, which he wished to procure on securities he held in bonds on the State of Georgia, amounting to $65,000, and which he would leave as collateral until he returned the amount loaned, say ninety days, and which he would then repay from his new cotton crop; and Nathans asked me if I could procure said loan—to which I replied, yes; that I could no doubt obtain the loan, if all was right. I asked Mr. Nathans if he had seen the bonds; to which he replied he had not, but that he told Williams to call at his store next morning at 10 o'clock, he having a friend who perhaps could accommodate him; and next morning, Tuesday, May 28th, at half-past 10 o'clock, I was at Nathan's store awaiting said Williams, who entered about a quarter before 11 o'clock, when Nathans introduced me to Williams as the person from whom he intended to obtain said sum, and Williams confirmed what Nathans had said to me the evening

previous, and repeated it in substance. I replied I could get said loan for him if all was made satisfactory to me, at the same time asking him if he had said securities with him to shew me; when he replied he had not, but they were at his boarding-house, and he could bring them at 1 o'clock. I told him he could bring them to my store 88 South Front Street, where I should stay until a quarter after 1 o'clock. Mr. Nathans said he would be at my store at the same time. I asked him what house he was stopping at, and he replied, Bloodgood's. I then began a general inquiry of Williams as to what part of Georgia he was from. He replied, Stewart County, in the lower part of Georgia. I questioned him thoroughly as to the State of Georgia, to all of which he replied as a resident should. I inquired about persons by their names, residents of that State at Savannah and Macon, whom he appeared familiarly acquainted with. I then left Nathans' store about half-past 11 o'clock, telling Williams I would then make inquiries as I went down town through Third Street among the principal brokers and banks, then to ascertain at what rates said sum could be raised. On my way down Third Street, somewhere between Market and Arch, I met Mr. Bullitt, of the firm of Bullitt & Fairthrone, and stopped, and asked Mr. Bullitt if he loaned money out on securities for a short loan, saying a gentleman with whom I got acquainted wanted $6,000 on the best of securities, viz: Georgia State bonds bearing interest in ten-fold collateral for the amount required; that I could make a commission on said transaction if I could obtain said loan, as the parties could have no objection to paying for it; to which he replied, that sometimes he did such business. I then asked him if he could let me know within an hour whether he could accept the same; as, if he would, I would make no farther inquiries, as I expected to see Williams about 1 o'clock with the securities, and wanted to give him some definite reply. Mr. Bullitt answered he could let me know before that time.

I received a note from Mr. Bullitt about half-past twelve, saying he could not effect the loan.

Mr. Williams handed me the bonds at 3 o'clock, and I offered them publicly to the brokers and banks on that day and the next without success. On Wednesday, the 29th May, 1850, I showed the bonds to Mr. Johnston at his office in Third Street, and asked him if he would negotiate them, and stated the amount I wished upon them—$6,000. He said he would examine the bonds, and he examined them one by one at his desk, talking during the time with his partner about the bonds. He agreed to take the bonds at 1½ per cent. per month. I told him that was too high, but would submit it to the owner of the bonds. I did submit it to Williams, and he agreed, provided I could not do better. I tried to do better until 2 o'clock, when I went to Mr. Johnston and told him I supposed he must have the bonds. His offer was to be kept open till 2 o'clock. I then handed the bonds to him, asking him to count them, to take charge of them carefully.

There were four bonds of $10,000 each, four of $5,000 each, and five of $1,000 each—in all $65,000—all payable to the order of R. J. Williams. He told me to call next morning any how, and he would give me the money.

I saw Williams at my store, and told him to go with me at 9 o'clock the next morning, and I would procure him the money. I told him I had left the bonds with a banking house in Third Street, and by 9 o'clock next morning I would procure him the money.

The next morning I stopped at Mr. Johnston's office at half-past 8 o'clock, and asked whether I should bring the man there, or whether he (Johnston) would come to my office, and complete the matter. He said, I should bring the man to his office, and he would settle the matter at any hour.

On the 29th, I asked Mr. Johnston what he required Mr. Williams to do in relation to the form of the note. He said, to draw a note at 90 days in his own favor for $6,000, which he would keep with and as collateral to the bonds. Williams was to draw the note in favor of himself as payee, which he was to meet at maturity, and Johnston was to give a receipt for the bonds as collateral security for the loan ; and Williams

was to give an agreement, that in case the note was not paid at maturity, he was to have liberty to sell enough of the bonds to reimburse himself for the amount of the loan.

The same day, the 29th May, at my office, Williams drew his note for $6,000 in his own favor, in pursuance of the arrangement with Johnston. I observed him draw the note, because I wished to observe whether his hand-writing corresponded with the endorsement on the bonds; and I was satisfied when I saw it, that he was the man who had endorsed the bonds—I mean, who signed the receipts for the interest on the bonds.

On the morning of the 30th, as I was about leaving the office of Mr. Johnston at about a quarter before 9 o'clock, he called me back. I said, what was it ? He replied in a quiet manner, I must ask you to endorse this note. I replied, I shall do no such thing. I had nothing to do with it; the transaction is your own. You lend your money; you must be satisfied all is right. He replied : I know all is right; I have security in ten-fold the amount of my loan. He replied : I do not ask you to endorse for the sake of responsibility on the note, for I would not part with my money if I thought anything was wrong; but I want it for you to identify the man in case anything should turn out wrong, that you can be a witness for me that I paid my money out innocently, and may look to parties by whom the bonds may have been lost, or from whom they might have been stolen, as I had notice that such bonds had been lost or stolen—as there may be another R. J. Williams, (that is the only contingency in it,) that I wish you to endorse it. To which I replied, that if that is all—if it is merely for identity, and not for responsibility, I would endorse it. I then agreed to endorse the note on those conditions.

I brought Williams to Johnston's office at 10 o'clock. The negotiation was then completed, a new note drawn, dated the 30th May, 1850, for $6,000, drawn by Williams, and which I endorsed on terms aforesaid. Mr. Johnston gave his check to Williams in his (Williams') favor, on Girard Bank, at the same

time asking me for my check for $360, being the amount of interest which he charged for the loan. I gave my check for the interest, and Williams gave me Johnston's check for $6,000, and I gave Williams my check for $5,440.

The same evening at 7 o'clock, Mr. Johnston called at my house, and told me the whole transaction was a forgery from beginning to end. I asked him how he learned it. He said, he ascertained the bonds had been offered about a fortnight before to Mr. Drexel, and he was satisfied it was a forgery, and wanted me to be ready to go to New York on Saturday, the 31st May, for him, as he might attempt to operate in New York on Saturday, being the last day of the week, and we might catch him, I knowing him.

I was ready next morning at 7 o'clock to go to New York, but neither I nor Mr. Johnston went. He changed his views, and said he would telegraph throughout the United States, and I should go to his office and help him. We telegraphed. The notices were written and commented upon with Bullitt & Fairthorne in their office.

About the 20th June, 1850, I received a letter signed R. J. Williams, which is now in possession of Johnston. Johnston having obtained a true bill of indictment against Williams in the County Court here, he obtained a requisition from the Governor of Pennsylvania, and went to Charleston.

I was in Georgia last November, at Macon; and I believe I saw R. J. Williams there in the street, and in Mr. Brown's bar-room, with Judge Cook. I am almost satisfied it was R. J. Williams I saw, but cannot swear positively it was he. The man I saw was called Spencer Riley there. It was Saturday, and his beard was long, and he was dressed differently from what he was here. In my mind I believe Spencer Riley and R. J. Williams are the same.

8d. He answers: A receipt was given by R. Johnston to R. J. Williams for the bonds left with him, as before described. I know nothing of the business card inquired for in this interrogatory.

R. J. Williams exhibited to me with the bonds a letter of

introduction, purporting to have been written by Mr. Craw-
ford, Secretary of one of the Departments at Washington,
and addressed to Barings Brothers, in favor of R. J. Williams.

For all other matters inquired of in this interrogatory, I
refer to my answer to second interrogatory.

4th. He answers: I did not observe Mr. Johnston observ-
ing Williams particularly—not more particularly than business
men generally do in transacting business matters.   Mr. John-
ston acted perfectly easy in paying over the money, and did
not have any suspicion of anything wrong.

To 1st *cross interrogatory*, he answers: I do not know any-
thing that would tend to shew that Spencer Riley is not the
individual from whom the bonds were received.

To the additional cross interrogatories, he answers: I was
not in Macon, Ga., in August or September, 1850, but was
there in November, 1851, and I do not recollect making any
inquiries for Spencer Riley of E. E. Brown, Esq.   While
taking supper with Mr. Brown, we had a conversation about
Spencer Riley.   I do not know Col. John Mitchell that I
recollect of, and do not know of my ever having had any
conversation with any such person.   At the conversation at
supper, I may have told E. E. Brown that I had seen Spencer
Riley, and that he was the identical person I had seen as Ro-
bert J. Williams in Philadelphia, and from whom I received
Georgia State bonds; that I believed he was the same, but
that his dress and appearance was so different I could not say
positively.   I believe I did say to said Brown then that Spen-
cer Riley could beat Monroe Edwards, whose character was
so well known for forgery, or words to that effect.

Thurston R. Bloom, sworn, says: In the spring or early in
the summer of 1850, Mr. John T. Smith wrote to witness
inquiring if he had the grants to four certain lots of land.
He answered he had, and was then informed they were irreg-
ular.   I carried them to Milledgeville, and found them forge-
ries.   The lots had been granted to others.   Spencer Riley
delivered said lots to witness, and he has since settled with
witness for said forged grants.

Johnston *vs.* Riley.

*Cross-examined.* When the grants were discovered to be forgeries, witness went to Riley and told him of it. Riley then took them to Milledgeville, and returned, saying that he would settle with witness for them. He stated that he had been sick, and had an agent at the time these grants were obtained, and his agent had access to the office at Milledgeville.

Wm. B. Parker says: In January, February, March and April, 1842, witness employed Spencer Riley to grant lands for him, and never doubted them before 1850. On selecting one, discovered that it was forged. It had not been registered at Milledgeville. Governor Towns informed witness that said grant was forged. Witness then called on Riley, and informed him of it, and asked him how many of said grants were forged. Riley then brought him a list from his own private record of more than three thousand acres in the same predicament; said he had gotten a young man to assist him. Riley made a strong appeal to the sympathies of witness, and proposed to make amends.

*Cross-examined.* Can't say what said grants cost. Riley settled in lands, at his own valuation, of $2,000 value. Can't say if Riley had time to get his list of the forged grants from Milledgeville. He got them from his own private record.

Defendant here proposed and sought to introduce testimony of Riley's general character touching the *crimen falsi*, which the Court overruled, and defendant excepted.

The forged bonds were then introduced.

Defendant closed.

Plaintiff introduced E. E. Brown, who stated that Rowland Cromlein wanted witness to get Riley to admit that he was the same man who passed the forged bonds. Cromlein said he was certain he was the same man.

John T. Mitchell says: I have seen Cromlein. Three or more persons walked into Brown's bar, and Cromlein asked if Riley was in the crowd. I said he was the lame man.

*Cross-examined.* I knew there were two Cromleins. The one who testified was here in September or October. I know this one is the witness.

VOL. XIII 17

Brown, recalled, said : Rowland Cromlein was the one who made the inquiry of Col. Mitchell.

Testimony here closed.

And the Court, among other things, charged : That if a demand was made by the Governor of Pennsylvania upon the Governor of Georgia for Robert J. Williams, it was illegal for the Governor of Georgia to add the *alias;* and every person who acted under him was a trespasser.   And instructed the Jury that they were bound to find for the plaintiff, but what amount they must determine ; and the Jury returned a verdict for the plaintiff for five hundred dollars.   And the counsel for the defendant, on this 31st day of December, being within thirty days from the adjournment of the said term of the said Court, tenders his bill of exceptions, and says :

1st. The Court erred in overruling the said demurrer to said plaintiff's declaration.

2d. The Court erred in repelling the testimony going to prove plaintiff's general character touching the *crimen falsi.*

3d. The Court erred in charging the Jury, that if a demand was made by the Governor of Pennsylvania on the Governor of Georgia for Robert J. Williams, it was illegal for the Governor of  Georgia to add the *alias,* and that every man who acted under him was a trespasser.

4th. The Court erred in instructing the Jury that they were bound to find for the plaintiff.

Poe & Nisbet and Hardeman, for plaintiff in error.

Stubbs, B. Hill and Rutherford, for defendant.

*By the Court.*—Warner, J. delivering the opinion.

[1.] The first ground of error assigned upon the record to the judgment of the Court below is, the overruling the demurrer to the plaintiff's declaration.   The declaration of the plaintiff contains three counts.   The first count, though it

Johnston *vs.* Riley.

concludes in trespass, is, in its general structure and allegations contained therein, more of the character of an action on the case for a malicious prosecution, than trespass for false imprisonment. But there is no doubt, that at least one of the other two counts is a *good count in trespass;* and, inasmuch as there was no demurrer to the declaration for a *misjoinder* of different causes of action, the general demurrer of the defendant thereto, on the ground that the action was *misconceived*, was properly overruled. The case, as it stood for trial before the Court and Jury, was an action of trespass for false imprisonment.

[2.] The second assignment of error is, that the Court rejected the evidence offered by the defendant, of the plaintiff's general character touching the *crimen falsi.* The technical signification of the term *"crimen falsi"* is understood to be *forgery of any kind*—perjury, dealing with false weights and measures, altering the current coin, making false keys, and the like. 1 *Bouvier's Law Dictionary*, 396. 1 *Greenleaf's Ev.* §373. The record in this case does not state *what particular facts* the defendant offered to give in evidence touching the general character of the plaintiff in regard to the *crimen falsi;* and even if it had, and such facts were admissible in an action of trespass of this character, yet, such facts could not have been given in evidence on the trial of this case, for the reason, that there is no allegation in the defendant's plea which would authorize it, according to the provisions of the Judiciary Act of 1799. There was no error, therefore, in the ruling of the Court below upon this point. The third assignment of error is to the charge of the Court, to the Jury.

The Court below instructed the Jury, "that if a demand was made by the Governor of Pennsylvania, upon the Governor of Georgia, for Robert J. Williams, it was *illegal* for the Governor of Georgia to add the *alias*, and every person who acted under him was a trespasser, and that they were bound to find for the plaintiff, but what amount they must determine."

It appears from the transcript of the record now before us,

that at the June sessions of the Court of Oyer and Terminer and Quarter Sessions of the Peace, for the City and County of Philadelphia, in the Commonwealth of Pennsylvania, in the year 1850, a bill of indictment was found by the Grand Inquest of that County, against Robert J. Williams, for the offence of forgery.

On the 25th day of June of that year, the Governor of the State of Pennsylvania made a requisition upon the Governor of the State of Georgia for the said Robert J. Williams, as a fugitive from justice, who, it was alleged, had taken refuge within the latter State, and appointed Robert Johnston as the agent to secure the said Williams, and convey him to the State of Pennsylvania to be dealt with according to law. On the first day of July, 1850, the Governor of Georgia issued his mandate, directed to all the Sheriffs and Constables of the State, commanding them to arrest said fugitive from justice, and deliver him over to the agent appointed by the Governor of Pennsylvania to receive him, as requested, in order that the said fugitive from justice might be carried back to the State in which the offence was alleged to have been committed. With a sincere desire to afford the authorities of Pennsylvania every means within his power to obtain the possession of the fugitive from justice, the Governor of Georgia (for reasons which appear from the testimony contained in the record) inserted in the mandate issued by him for the arrest of Robert J. Williams, the words, "*alias* Spencer Riley." On the 2d day of July, 1850, the Sheriff of Bibb County arrested Spencer Riley, a citizen of that County, by virtue of the warrant so issued by the Governor for the arrest of Robert J. Williams, *alias* Spencer Riley, as a fugitive from justice. The return of the Sheriff on the warrant states, that he had "arrested the body of the within named Spencer Riley, as directed and required by the within named Robert Johnston; having tendered him to the said Robert Johnston, who requested me to hold him until he was ready to leave, and have him in my custody." For reasons which appear in the record of the testimony, the agent, Johnston, did not take Riley to

the State of Pennsylvania, but he was discharged from the custody of the Sheriff.

[3.] Inasmuch as this record presents a question of the first impression in our Courts, we will avail ourselves of the occasion to express our general views, in relation to the duties and obligations of the Executive officers of the several States in the delivering up of fugitives from justice, to be removed to *the State having jurisdiction of the crime*, as provided by the Constitution and laws of the United States.   It is unquestionably true, that each State has a perfect right to enact such penal laws, to operate within its own territory, as may, in her judgment, best protect persons and property; provided, always, that such laws are not *repugnant* to the supreme law of the United States.   Whenever the laws of such State are violated within its territorial jurisdiction, and the offender flees into the territory of another State, the supreme law of the land declares, that such fugitive *shall be delivered up on demand of the Executive authority of the State from which he fled* to that State having jurisdiction of *the crime*.   See 4 *Article Constitution United States*, §2.   By the Act of 1793, provision is made to carry into *practical* effect this provision of the Constitution.   All that is required of the Executive authority of any State in the Union, when a fugitive from justice is demanded of the Executive authority of any other State, is, to produce the copy of an *indictment found*, or an *affidavit made* before a Magistrate of such State, charging the person so demanded with having committed a *crime against the laws thereof*, duly certified as authentic, by the Chief Magistrate of the State from whence the person so charged fled.   This being done, the Executive of the State upon whom the demand is made for the surrender of the fugitive, is not authorized, under the Constitution and the law enacted to carry into *practical* effect that special provision of it, to look behind the indictment, or affidavit, in which the crime against the State is charged, and inquire, whether, by the laws of his own State, the facts alleged would constitute a *crime in that State;* for, we take it to be a well settled prin-

ciple, that by the law of nations, sovereignty, united with the domain, establishes the *exclusive* jurisdiction of a State or nation, within its own territory, as to *crimes*, and to rights, arising therein. *Vattel, book 2, chap.* 7, §§84, 85. This principle applies with peculiar force to the confederated States of the American Union, embracing, as they do, such a distinct variety of soil, climate, pursuits and institutions.

[4.] Such penal enactments as might be wholly useless in some of the States, are *indispensably necessary* in others, for the protection of property and the welfare of society.

[5.] We are not aware that the several States of the Union, when they ratified and adopted the provisions of the Constitution of the United States, *surrendered* the acknowledged right, which they respectively enjoyed, as sovereign and independent States, to declare, *within their territorial limits*, what should be considered a *criminal offence;* and, if not, they still retain it in as full and ample manner, as they did before the ratification and adoption of that instrument.

[6.] For, it is expressly declared therein, that "the powers *not delegated* to the United States by the Constitution nor *prohibited* by it to the States, are reserved to the States respectively, or to the people." The distinct proposition which we intend to assert and maintain, is, that a State has the same undeniable and unlimited jurisdiction over all persons and things within its territorial limits as any foreign nation, where that jurisdiction is not *surrendered* or *restrained*, by the Constitution of the United States. It was to assert and maintain this great principle of *State sovereignty* that, with great humility, I dissented from a majority of the Judges in convention, at their July session, at Milledgeville, in 1834, in the case of *Walter S. Adair et al. vs. Hugh Hamil et al. See pamphlet, published by order of the House of Representatives, in 1835, relating to the judicial administration of the Hon. John W. Hooper, page 25.* Subsequent observation and experience, most certainly has not induced me to change or qualify my individual opinion as then expressed, in relation to the *reserved rights* of the States.

Johnston *vs.* Riley.

[7.] As between sovereign and independent nations, the harboring and protecting criminals, and refusing to surrender them up on demand, to that government whose laws have been violated, may be considered as *just cause of war* ; but *one State* of the American Union is prohibited, by the Constitution, from declaring war against *another State*, in order to obtain redress for this *wrong* and *bad faith* on the part of the offending State ; and hence, the obligation imposed by the Constitution, may be urged, with *increased force*, in favor of the delivery of the fugitive who may be charged *in any State*, with a *criminal offence* against the laws of such State.   In order to secure a *faithful execution of this*, as well as the other provisons of the Constitution, each Executive officer of the several States is required to swear that *he will support it.* To refuse to deliver up a fugitive from justice by the Executive officer of the State in which such fugitive may have taken refuge, on *the legally authorized demand* of the Executive officer of the State from which he fled, on *the pretext,* that by the laws of the State in which the fugitive is found, he is not guilty of any criminal offence, would be, in our judgment, an *open, palpable violation of the Constitution,* to say nothing of the *comity* and *good faith,* which ought always to exist between all civilized independent States, and more especially, between the confederate States of the American Union.

[8.] The Governor of Georgia, being deeply impressed with the necessity of discharging his whole constitutional duty to our sister State of Pennsylvania, in regard to the surrender of the alleged fugitive from justice, and believing that Spencer Riley was the same individual, who, under the assumed name of Robert J. Williams, had perpetrated the crime charged in the indictment against the laws of that State, and supposing it would be necessary to authorize his arrest and delivery to the agent appointed to receive him, under the Act of 1793, that his name should be inserted in the warrant issued for that purpose, it was accordingly so done, and the ministerial officers of the State were directed to arrest the

body of Robert J. Williams, *alias* Spencer Riley, and deliver him up to the agent of the State of Pennsylvania, that he might be carried to that State, within whose jurisdiction the crime was alleged to have been committed.

The Governor of Georgia, as is quite apparent from the record, did not attempt to shelter himself under any mere *technical quibble*, from the discharge of his constitutional duty to the State of Pennsylvania in delivering up the alleged fugitive ; but manifested that generous confidence in the properly constituted legal tribunals of *that State*, in relation to *his trial and punishment there*, which ought always to obtain between the Executive officers of each State, towards their sister States, whenever called on to perform their respective duties in regard to the surrender of *fugitives*, under the express provisions of the laws and Constitiution of the United States.

But it is said, that the Governor of Georgia had no legal right, on the requisition of the Governor of Pennsylvania for the delivery of Robert J. Williams, to issue a warrant for the arrest of another individual (to wit) Spencer Riley.

As a distinct legal proposition, it is undoubtably true, that the Governor of Georgia had no such right : but the error was committed by him in doing that which he believed to be a faithful discharge of his constitutional duty towards the State of Pennsylvania. The insertion of the *alias* was not necessary, in our judgment, to have authorized the arrest of Riley, if, indeed, he was *the same individual* who committed the forgery, under the assumed name of Robert J. Williams. Had Riley been arrested under the warrant issued for the arrest of Williams, without the insertion of the *alias*, and been carried to the State of Pennsylvania, and put upon his trial in the Court in which the indictment was found, as the defendant named therein, and had pleaded in abatement that his name was not Robert J. Williams, the person named in the indictment, but that his name was Spencer Riley, a different person, it would have been competent for the prosecutor to have replied, that he was *the identical person* who committed the

Johnston *vs.* Riley.

crime, and that he was as well known by the name of Robert J. Williams, as that of Spencer Riley; or that, at the time of committing the crime, he represented his name to be Robert J. Williams, and upon proof of the facts contained in such replication he might have been properly convicted. 1 *Chitty's Crim. Law, marginal page* 449. *Archibold's Crim. Pleading*, 47, 48. 1 *Comyn's Dig. Abatement, letter F*, 18. But the party making the arrest, would have taken the *responsibility* of proving the *identity* of the person so arrested. The Governor of Georgia not having had any legal authority to insert the *alias* in the warrant issued by him, it must be considered as a warrant issued for the arrest of Robert J. Williams only. The defendant in the Court below, in contemplation of law, procured and directed the arrest of Spencer Riley, by virtue of a warrant issued for the arrest of Robert J. Williams.

[9.] When a warrant issues for the arrest of W. and R. is arrested under it, although W. and R. may be the *same person*, all who are concerned in the arrest are trespassers. *Cole vs. Hindon*, 6 *Term Rep.* 234. *Caffall vs. Huntley*, 4 *English Com. Law Rep.* 331. *Scandover vs. Warne*, 2 *Campbell's Rep.* 270. *Shadgett vs. Clipson*, 8 *East.* 328. *Griswold vs. Sedgwick*, 6 *Cowen's Rep.* 445. *Scott vs. Ely*, 4 *Wendell*, 555.

[10.] To constitute a justification in such a case, the defendant must allege in his plea, and prove that W. and R. are the same person, that R. is as *well known by the name of W. as by the name of R. or that R. represented his name to be W. at the time of the commission of the crime for which he is arrested.* The defendant in this case did not plead *justification*; he only pleaded that he had *probable cause* for making the arrest. Had the defendant plead the warrant under which the arrest was made, and the other proceedings on which it was founded in justification, and had further alleged in his plea, that the defendant was as well known by the name of Robert J. Williams, as Spencer Riley; that at the time the offence was committed in Philadelphia, the plaintiff represented his

name to be Robert J. Williams, and was` in fact, the same identical person who assumed the latter name at the time, we should have held such plea, upon principle, to have been good.

Upon such plea having been filed, it would have been competent for the defendant to have requested the Court, to have instructed the Jury, at the trial, that if they believed, from the evidence, that the plaintiff was *the same person*, who, under the assumed name of Robert J. Williams, committed the forgery in Philadelphia, they should find a verdict for the defendant; for there is certainly evidence in the record which would authorize the Court to have given such instruction to the Jury. But there being no such plea filed, and as the case stood before the Court upon the pleadings, there was no error in the Court below, in charging the Jury, that they were bound to find a verdict for the plaintiff. While we should have been much better satisfied if the Jury had found a verdict for the plaintiff for merely *nominal* damages, yet, it was a matter *exclusively* within their province, to judge of the credibility and effect of the evidence submitted to them; and not being able to find any legal ground on which to reverse the judgment, it must, therefore, stand affirmed. Let the judgment of the Court below stand affirmed.